**ADOLFSON v. UNITED STATES.**

No. 11181.

Circuit Court of Appeals, Ninth Circuit.

Feb. 6, 1947.

Rehearing Denied March 4, 1947.

Writ of Certiorari Denied May 5, 1947.

See 67 S.Ct. 1307.

884

Leo R. Friedman, of San Francisco, Cal., for appellant.

Frank J. Hennessy, U. S. Atty., and Daniel C. Deasy, Jr., Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

Before DENMAN, HEALY, and BONE, Circuit Judges.

BONE, Circuit Judge.

Appellant was indicted and convicted on a jury trial for alleged violation of Section 87 of Title 18, U.S.C.A. From the judgment and sentence this appeal is prosecuted. The charging part of the indictment reads:

"That Eric Adolfson and Ben Amdursky (hereinafter called 'said defendants'), did, on or about the 18th day of May, 1945, in the City and County of San Francisco, State of California, in the Southern Division of the Northern District of California, and within the jurisdiction of this Court, unlawfully, wilfully and knowingly apply to their own use property of the United States of America furnished and to be used for the armed services, to-wit: 24 Elgin wrist watches, 100 Parker 51 fountain pens, and 56 Shaeffer fountain pens, of a market value in excess of the sum of $50.00, said defendants then and there well knowing the said property was the property of the United States of America furnished and to be used for the armed services."

Scott (a private in the United States Marine Corps) and Seelye (a civilian mechanic working at Encinal Terminal in Alameda County, California) were two witnesses who testified to stealing the Government property described in the indictment and to the sale of the stolen watches and fountain pens to appellant. They testified that they had pleaded guilty to a charge of larceny of the property prior to the trial of appellant, and were at the time awaiting imposition of sentence. Scott specifically denied (on cross examination) that leniency in the matter of his sentence had been suggested in case he testified in this case and Seelye stated that the fact that he was awaiting sentence did not influence his testimony in respect to a certain matter concerning which he was questioned. Both stated that they had discussed the facts of the case with Government agents on various occasions.

There was evidence also tending to establish the following facts:

During the months of March to May, 1945, the United States Navy Department maintained a shipping and storage plant known as the Encinal Terminal (where

Seelye worked). During these months a shipment of fountain pens was made to this plant for further shipment overseas from the Naval Supply Depot in San Francisco. Also, a shipment of Elgin wrist watches made to Marine Corps specifications, was sent to Encinal Terminal from the Marine Corps Supply Depot in San Francisco for further shipment overseas. These articles had been purchased by and were the property of the United States and were stored in what was known as the Radar Corral at the Encinal plant. Scott was assigned to guard duty at that place and while performing this duty he and Seelye stole about 158 of these fountain pens and 24 of these watches, they being taken from the Encinal Terminal enclosure by Seelye. On May 17, 1945 Scott and Seelye sold these pens and watches to appellant, Adolfson, who made the purchase at a cigar store he operated on Market Street in San Francisco, California.

The pens (similar to those sold in civilian stores) were intended for sale in Navy ships' stores to any person in the Navy who cared to buy them. They were not issued to the enlisted men as part of the equipment of the Marine Corps. A watch of the kind here involved was issued to enlisted men and non-commissioned officers only in case where a watch was required in an assigned "job" or work. They might not purchase it but were required to return it when the requirement had been completed. Where commissioned officers required a watch permanently they were compelled to purchase it. All such purchases of pens and watches were coupled with a restriction that such articles might not be shipped back to civilians in the United States.

At the time Scott and Seelye sold these stolen pens and watches to appellant, Scott was wearing his uniform as private first class in the United States Marine Corps and was to some degree under the influence of liquor. The sale included approximately 100 Parker fountain pens each having a then retail value of $15.00, and 56 or 58 Shaeffer fountain pens each having a then retail value of $12.50. At the time and in the same transaction they sold and delivered to appellant 24 of the stolen Elgin wrist watches, each watch having a then retail value of $47.50. For all of this property the appellant paid something over $1,000 in cash to Scott. During the negotiations and before completing the purchase, appellant left his place of business twice for brief periods (Scott and Seelye remaining in his store) stating at the time that he had to "see a friend." The name of this friend was Ben Amdursky and on one of these visits to him appellant took a pen, or pens, and one watch as "samples". He returned from these "trips" with a sum of money procured from Amdursky and paid Scott for the stolen property. The pens were enclosed in lots of 12 in small boxes marked in a way to identify them as Government property used in the Navy. Shortly after the purchase, appellant sold all except 4 of the pens and 4 of the watches to Amdursky. (See confession set out in footnote 1.)

The verdict indicates that the jury did accept the facts outlined above as having been established in the evidence beyond a reasonable doubt. To these facts should be added a certain written confession of appellant, hereafter referred to and admitted in evidence.

 Appellant asserts a fatal variance between the allegations of the indictment and the proof, *in that* the indictment charged an unlawful application of the property to appellant's own use (18 U.S.C. A. § 87) while the proof merely attempted to establish the receipt of stolen goods (18 U.S.C.A. § 101) or the unlawful purchase of naval or military property (18 U.S.C.A. § 86). His argument is that section 87 "is purely an embezzlement statute" (referring to its title); that the indictment charges embezzlement and nothing more and that to "apply the property of another to one's own use" is to embezzle it. The simple language of section 87 refutes that argument for it covers several specifically named offenses wholly apart and divorced from the technical offense of embezzlement. One of these specifically and separately named offenses is that of knowingly applying to one's own use property "furnished or to be used for the military or naval service". The prohibition against

knowingly applying Government property appears in the text of section 87 after the word "or" which follows the reference to the offense of embezzlement. The use of the word "or" clearly indicates alternative circumstances (cf. Barkdoll v. United States, 9 Cir., 147 F.2d 617, 618) and was obviously intended to identify and define a wholly separate and distinct offense, and we so hold. Appellant would have us read out of section 87 a meaning, a purpose, a definition and a protection of public property which to us clearly appears to speak the plain intent of the lawmakers.

Appellant advances four other grounds for reversal: (1) The trial court misdirected the jury by stating that the jury could find that the appellant knew of the stolen character of the goods solely on the fact that he purchased or sold such goods at a price disproportionate to their value; (2) that, as a matter of law, the offense charged could not have been committed, as the evidence failed to establish that the goods were of the character as defined in the statute; (3) the evidence was insufficient to establish the charge in that it failed to establish (a) that appellant knew the goods were property of the United States and (b) furnished or to be used for the military or naval service, or (c) that appellant knew the goods were stolen at all; (4) the trial court erred in failing to grant appellant's motion for a new trial. Our disposition of the appeal disposes of this fourth ground.

██ We consider the other three grounds. The instruction condemned by appellant reads as follows:

"You are instructed that if you find that the defendant Eric Adolfson sought to purchase or to sell the watches or fountain pens at a price disproportionate to the value of said watches or fountain pens, this fact may be considered by you as a circumstance from which you may infer that said defendant knew the watches and fountain pens were stolen."

Appellant contends, first, that it told the jury that knowledge of the stolen character of the property could be inferred from the bare fact that appellant bought or sold the pens and watches at a price disproportionate to their value, thus, in effect, telling the jury that a verdict of guilt could be predicated on such fact alone; second, it omitted the necessary element that appellant must have known the value of them. Corpus Juris is cited as stating the correct rule applicable to this situation.

"Inadequacy of Price Paid. Guilty knowledge cannot be inferred merely from the inadequacy of the price paid by accused for the property. Nevertheless, it is a material fact bearing upon the presence of guilty knowledge, and in connection with other facts in evidence * * * may be sufficient to show guilty knowledge." 53 Corpus Juris, p. 537, Sec. 94 (3).

Standing alone, the criticized instruction might be regarded as substantial error. But an examination of the entire record persuades us that the compelling force and significance of the entire body of evidence in this case justifies the conclusion that the giving of this instruction was harmless error. Appellant argues that a purchase of stolen property at a price disproportionate to its value is insufficient as a basis for an inference of guilty knowledge and that such *fact* (purchase price disproportionate to value) is only a cirmcumstance which, taken into consideration with other circumstances proved, may justify the inference of guilty knowledge. In this case the circumstance (fact) of disproportionate price paid when measured against the value shown by the testimony, appeared to be clearly established in the evidence. When considered in the further light of the inculpatory facts freely admitted in a written confession of appellant introduced in evidence, we think the instruction was sufficiently supported and was justified by a consideration of the entire body of evidence.

Considered as a whole the evidence supports the inference that the pens and watches were stolen Government property; that appellant did know from the information he had when he purchased them that the price he was paying was disproportionate to their value. The jury could and properly did consider and weigh the significance of appellant's visits to Amdursky and the transaction between them followed immediately by the purchase of the stolen goods from a United States Marine private in

uniform obviously somewhat under the influence of liquor. Also the sale of the pens and watches to Amdursky right after the purchase from Scott.

We agree with the Government that appellant was not "acting in the dark" on the question of value. The inference is inescapable that Amdursky had advised and informed appellant concerning the real value of the pens and watches prior to their purchase from Scott. Appellant did not testify or offer any explanation of this action in "consulting" his friend Amdursky.

All of this is made more apparent by the fact that on May 25, 1945, appellant, freely and voluntarily, made a written statement in the nature of a confession in the presence of a San Francisco police officer and a member of the F. B. I.[1] The confession was introduced in evidence over the

---

[1] "I, Eric Adolfson, make the following free and voluntary statement to Clement J. Dougherty, whom I know to be an officer in the Special Service Bureau of the San Francisco Police Department, and to Edgar A. Baird, Jr., whom I know to be a special agent of the Federal Bureau of Investigation. I know and have been told that anything I say may be used against me in a court of law. No threats, promises or duress have been used to induce me to make this statement.

"I was born in Sundvall, Sweden, on 4/30/03. I came to this country in September of 1920. I became a naturalized U.S. citizen in March 1943, at San Francisco. I reside at 259 Oak Street, San Francisco, and since December 20, 1943, I have operated a cigar store owned by my wife and located at 322 Market Street, San Francisco.

"Some time between April 15 and April 25, 1945, a man dressed in a uniform of a U. S. Marine came into my store and offered to sell me some Zippo cigarette lighters. I asked him where he had received these lighters and he told me he had bought them from a fellow in Oakland, California. He didn't show me any bill of sale or receipt, but when I asked him if he had secured the lighters legitimately, he said he had. I bought 144 Zippo lighters from this marine at that time, paying him $1.00 apiece or $144 in all.

"On April 30, 1945, this marine again came to my store with more Zippo cigarette lighters, and I bought another 144 lighters for $144. On one of my business cards which I have given to Agent Baird this marine wrote, 'Sold 144 lighters by Melvin Lott.' I dated the card 4/30/45.

"On May 17 or May 18, 1945, this same marine and a civilian came to my store and asked me if I wanted to buy some fountain pens and watches. I told them I couldn't sell that kind of merchandise but I would ask another man I knew if he could buy them. They left about one and a half dozen Shaeffer and one dozen Parker 51 pens with me and I gave them $220. I told them to come back later and I would know if my friend would take the other pens and watches which they wanted to sell. They then left the store. After they had left the store, I went across Market Street, to the Star Tailoring Company (I think this is the name) which is located at 305 Market Street and is operated by Ben Amdursky. I asked Ben if he could use some fountain pens and watches. I told him the marine had told me they weren't stolen, and he said he'd take them. Ben gave me $1,400 in cash and I went back to my store.

"About three hours later this Marine and the civilian with him again came into my store, and I bought 88 more Parker 't1' and 40 more Shaeffer fountain pens from them. I also bought 24 Elgin watches with round dials, steel cases and canvas straps. For all of these I paid $904, of which $754 was for the pens and $150 was for the watches. On another business card of mine the marine wrote 'Sold 100 Parker '51'–58 Shaeffer, Melvin Lott.' Nothing was written about the watches. I have also given this card to Agent Baird.

"I immediately turned over all except one of the watches and all but two Parker and two Shaeffer pens to Ben Amdursky.

"I made $276 on the whole deal.

"I do not know the names of either the marine or the civilian involved in this matter. However, I can identify each one of them.

"Although this marine told me that none of the lighters, pens or watches had been stolen, I know that they couldn't be bought or at least were very hard to buy on the civilian market because the army and navy were taking all of them. The marine had no papers to prove his ownership. I thought there was a good possibility that these items had been stolen. It sounded odd to me that a marine had possession of all these items.

"I wish to correct my statement made on page four and marked * Ben didn't

objection of appellant that the corpus delicti, that is, the knowledge required by Section 87 had not been established by independent evidence and therefore the document was incompetent, irrelevant and immaterial. We think that the Government did show corroborative independent circumstances tending to prove the corpus delicti and to fortify the truth of the written confession. It was properly admitted. See Pearlman v. United States, 9 Cir., 10 F.2d 460; Mangum v. United States, 9 Cir., 289 F. 213, 216; Wynkoop v. United States, 9 Cir., 22 F.2d 799; Wiggins v. United States, 9 Cir., 64 F.2d 950; Chevillard v. United States, 9 Cir., 155 F.2d 929. The order in which evidence to prove the corpus delicti is to be received is not important and is largely a matter within the discretion of the trial court. If proof in the nature of independent corroborative evidence supports the introduction of a confession, the time of its introduction is not important. It is sufficient if it is forthcoming at some point in the trial. All of the evidence in this case on which the Government relied was properly connected before the Government closed its case.

■ During the course of the trial several objections were made to the admission of testimony as to what was said in conversations of officers with appellant and Amdursky regarding the purchase of the pens and watches. These objections were also rested on the ground that at the time the proof was offered the Government had not established the corpus delicti by any inde-

pendent evidence, particularly as it related to the element of knowledge required by section 87. What we have said above disposes of this objection.

These conversations, admitted in evidence, together with the written confession of appellant, when considered in connection with the rest of the evidence and testimony in the case, clearly support an inference of "guilty knowledge" on the part of appellant, i.e., that he did "knowingly apply to his own use" property of the United States; that while so doing he knew the property was stolen. This evidence likewise supports the inference that he sought, and was seeking by said purchase, to acquire this stolen property at a price disproportionate to its value.

Under the challenged instruction, the jury was permitted to examine all of the evidence to ascertain therefrom whether there was proof, beyond a reasonable doubt, that at the time of the purchase, appellant's state of mind indicated a knowledge on his part that the purchased pens and watches were stolen and that the price he was seeking to (and did) pay for them was disproportionate to their value. The proof offered and necessary to establish "guilty knowledge" had to meet the exacting standards of proof in criminal cases, but the general instructions on reasonable doubt adequately protected appellant in that respect.

■ The "guilty knowledge," if it existed, necessarily had to be and could be shown by all the surrounding facts and cir-

give me the $1,400 until the civilian and the marine had come back with the rest of the pens and the watches.

"I have read this statement, consisting of 6 written pages, and sign it freely and voluntarily because it is true to the best of my knowledge and belief."

"It is signed Eric Adolfson and witnessed by Clement J. Dougherty, San Francisco Police Department, May 25, 1945, and Edgar A. Baird, Jr., FBI, San Francisco, 5/25/45.

"There is another page. It reads as follows:

"I, Eric Adolfson, wish to make the following correction in the statement which I have just made to Special Agent Baird of the FBI and Officer Dougherty of the San Francisco Police Department.

"I really only gave Ben Amdursky twenty watches and I kept four of them. I sold three of these watches over the counter of my cigar store to some Navy Officer. I charged $20 apiece for the watches.

'I sign this additional statement freely and voluntarily because it is true to the best of my knowledge and belief. No threats or promises have been made to me, and I know this statement can be used against me in a court of law."

"That is signed Eric Adolfson, and witnessed by Clement J. Dougherty, San Francisco Police Department, May 25, 1945, and Edgar A. Baird, Jr., FBI, San Francisco, 5/25/45."

cumstances. To establish this claimed guilty knowledge as a relevant and material *fact*, the prosecution introduced evidence showing appellant's acts and statements at the time of the purchase, which it claimed revealed a clear intention and purpose to accomplish the unlawful acts charged in the indictment. We regard this evidence as relevant and competent for the purpose of showing the charged "guilty knowledge" as a *fact*. This because the existence of this "knowledge" of the character and value of the property was a material and necessary element in the prosecution's chain of evidence, and it was therefore proper to submit it to the jury on the question of whether or not this guilty knowledge existed and was proven beyond a reasonable doubt. The jury having resolved this issue of fact against appellant it is conclusive upon us. Cf. Haid v. United States, 9 Cir., 157 F.2d 630, 632.

Appellant invokes the rule of ejusdem generis and contends that what section 87 *intended* to prohibit was the stealing or embezzlement of ordnance, arms, ammunition, or other military equipment, and the statute cannot be applied to the pens and watches here involved since they are not enumerated therein. This on the theory that they are no part of the military equipment of the Armed Forces.

We do not agree with this contention. We are not obliged to apply a rule of construction which would force us to write out of section 87 the phrase "or other property." To do so would be to hold that Congress had deliberately excluded from the ambit and protection of the statute certain important and widely-used articles and things of lesser importance than the major items enumerated. We take notice of the fact that the experience of modern global war has clearly demonstrated that pens and watches have become essential necessities for our Armed Forces both in the area of morale and practical war operations and the evidence in this case also establishes that they are articles and stores of this character. The fact that responsible public officials stress the high levels of education in these Armed Forces lends weight to this view.

The rule of ejusdem generis is a familiar and useful one in interpreting words by the association in which they are found, but under the facts in this case we feel that it gives us no warrant for narrowing provisions which the legislature has adopted with what appears to us to be a clear purpose to afford additional safeguards.

The evidence was ample to justify the verdict of the jury. Finding no error the judgment is affirmed.